**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **DEBRA L. KENNEDY,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00042 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant. | ) | UNITED STATES MAGISTRATE JUDGE |

*I.  Background and Standard of Review*

The plaintiff, Debra L. Kennedy, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Kennedy protectively filed her application for DIB on April 25, 2007, alleging disability as of February 15, 2007, based on degenerative disc disease, leg, knee and neck pain, carpal tunnel syndrome, bad nerves, osteoporosis and insomnia. (Record, ("R."), at 116-18, 132.) The claim was denied initially and upon reconsideration. (R. at 78-82, 85, 86-91.) Kennedy then requested a hearing before an administrative law judge, ("ALJ"). (R. at 92.) The ALJ held a hearing on July 16, 2008, at which Kennedy was represented by counsel. (R. at 37-75.)

By decision dated August 6, 2008, the ALJ denied Kennedy's claim. (R. at 13-23.) The ALJ found that Kennedy met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2009. (R. at 15.) The ALJ also found that Kennedy had not engaged in substantial gainful activity since February 15, 2007. (R. at 15.) The ALJ found that the medical evidence established that Kennedy suffered from severe impairments, namely back disorder, knee disorder and high cholesterol, but she found that Kennedy did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-19.) The ALJ also

found that Kennedy had the residual functional capacity to perform light work[1] that did not require standing for more than four hours in an eight-hour workday, with the option to alternate sitting and standing, only occasional postural manuevers and avoiding even moderate exposure to hazards. (R. at 19-21.) The ALJ found that Kennedy was able to perform her past relevant work as a video store owner/operator. (R. at 21.) Based on Kennedy's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Kennedy could perform. (R. at 21-23.) Thus, the ALJ found that Kennedy was not under a disability as defined under the Act and was not eligible for benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(f), (g) (2010).

After the ALJ issued her decision, Kennedy pursued her administrative appeals, (R. at 9), but the Appeals Council denied her request for review. (R. at 1-6.) Kennedy then filed this action seeking review of the ALJ's unfavorable decision which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2010). This case is before the court on Kennedy's motion for summary judgment filed November 17, 2010, and on the Commissioner's motion for summary judgment filed December 15, 2010.

## II. Facts

Kennedy was born in 1958, (R. at 116), which classifies her as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). She has a high school education. (R. at 140.) Kennedy has past relevant work experience as a

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2010).

video store owner/operator, a presser in a sewing factory, a presser for a dry cleaner and as a sales clerk. (R. at 142.)

In rendering her decision, the ALJ reviewed records from Dr. Thomas Phillips, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Joselin Tacas Tacas, M.D.; E. Hugh Tenison, Ph.D., a state agency psychologist; Eugenie Hamilton, Ph.D., a state agency psychologist; and Dr. William McIlwain, M.D. Kennedy's attorney submitted additional medical records from Russell County Medical Center; Community Medical Care; Blue Ridge Orthopedics & Sports Medicine; Dr. Tacas; and Dr. Gregory Corradino, M.D., to the Appeals Council.[2]

The record shows that Kennedy treated with Dr. Joselin Tacas Tacas, M.D., with Community Medical Care from July 26, 2006, to December 22, 2008. (R. at 228-46, 367-408, 442-55, 465-72, 481-95.) On July 26, 2006, Kennedy complained of fatigue and sinus congestion. (R. at 241.) Kennedy denied any neck or back pain, muscle aches or joint pain, swelling or stiffness or psychiatric complaints. (R. at 242.) Kennedy reported a history of brain surgeries to insert a shunt. (R. at 242.) She did report that she had suffered from anxiety/depression since January 11, 2004. (R. at 243.) An examination showed that Kennedy had full ranges of motion in her neck and back with no tenderness. (R. at 244.) An examination of Kennedy's extremities also showed full range of motion with no swelling or tenderness in her shoulders, elbows, hips, knees, ankles hands and feet. (R. at 244.)

---

[2] Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 1-6), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

Dr. Tacas diagnosed acute sinusitis and gave Kennedy a prescription for an antibiotic. (R. at 245.) She also stated that Kennedy's complaints of anxiety and depression were chronic, but controlled by medication. (R. at 245.)

Kennedy was treated at the Russell County Medical Center Emergency Department on December 20, 2006, for complaints of suffering a kidney stone attack. (R. at 203-04.) Kennedy followed up with Dr. Tacas the next day, complaining of urinary burning and pain in her right flank. (R. at 238.) Dr. Tacas noted a history of kidney stones. (R. at 238.) Kennedy again noted no complaints of neck, back or joint pain, and examination showed full ranges of motion and no tenderness in her neck, back or extremity joints. (R. at 239-40.) Dr. Tacas admitted Kennedy to Russell County Medical Center. (R. at 240.) A CT scan confirmed a kidney stone in her left kidney without obstruction. (R. at 205.) Kennedy was discharged the next day with a referral to an urologist. (R. at 206.)

On January 3, 2007, Kennedy returned to see Dr. Tacas with a complaint of back pain for the past three weeks. (R. at 232-36.) Kennedy complained of back pain, which was worse when she sat or stood for more than an hour. (R. at 232.) Kennedy complained of numbness in her left leg and knee with dull pain. (R. at 232.) She denied any trauma or heavy lifting at work. (R. at 232.) Kennedy stated that she had seen an urologist, who had told her that kidney stones were not the cause of her back pain. (R. at 232.) Kennedy denied any neck pain or any musculoskeletal pain other than pain in her lower back and left leg. (R. at 232-33.) Kennedy did complain of continuing anxiousness/stress. (R. at 233.) An examination showed full range of motion in Kennedy's back, but there was

tenderness and spasms in her left lower back with negative straight leg raises. (R. at 235.) Dr. Tacas prescribed Percocet, Lodine and Flexeril. (R. at 235.)

On January 18, 2007, Kennedy saw Chris Castle, a nurse practitioner with Bristol Orthopaedic Associates, P.C. (R.at 258-62.)  Kennedy complained of low back, left knee and left leg pain. (R. at 258.)  Kennedy also gave a history of her left knee giving way. (R. at 260.)  Castle noted that Kennedy was ambulatory without the aid of any assistive devices. (R. at 260.) Castle's examination showed tenderness along the joint lines of the medial and lateral aspects of the left knee and decreased range of motion due to pain. (R. at 260.)  Castle ordered a CT scan of Kennedy's lumbar spine and left knee. (R. at 261.)  Castle stated that Kennedy's findings were clinically suggestive of internal derangement of the left knee. (R. at 261.)  Kennedy was scheduled to return on January 25, 2007. (R. at 261.)

A CT scan of Kennedy's lumbar spine taken on January 23, 2007, showed a small disc protrusion at the L5-S1 level which appeared to displace the left S1 nerve root. (R. at 221.)  There also was a small disc protrusion at the L3-4 level with no nerve impingement.  (R. at 221.) The radiologist also noted some spinal stenosis at the L4-5 level. (R. at 221.)

On January 25, 2007, Castle noted that the CT scan of Kennedy's knee show no abnormalities in the bony structure. (R. at 264.)  Castle's notes also recite the radiologist's findings regarding the CT scan of Kennedy's lumbar spine. (R. at 264.) Based on her clinical presentation, Castle recommended and Kennedy decided to undergo surgical intervention. (R. at 264.) An Operative Report shows that Dr. William A McIlwain, M.D., performed arthroscopic surgery on Kennedy's

left knee to repair torn medial and lateral menisci on February 7, 2007. (R. at 210-15.) Upon discharge, Dr. McIlwain diagnosed Kennedy with severe osteoarthritis of the left knee. (R. at 209.) Dr. McIlwain stated that Kennedy could return to activity as tolerated. (R. at 209.)

Kennedy returned to see Castle on February 15, 2007. (R. at 266-67.) Kennedy stated that she had experienced relief from her presurgical pain. (R. at 266.) Castle noted that Kennedy was walking without any assistive devices. (R. at 267.) Castle noted minimal edema in Kennedy's left knee. (R. at 267.) Castle recommended that Kennedy remove her surgical stitches in one week, and he prescribed outpatient physical therapy. (R. at 267.) Kennedy returned to see Castle on March 22, 2007. (R. at 268-70.) Castle noted a well-healed surgical incision with no edema. (R. at 269.) Kennedy complained of some tightness and an inability to fully extend her left leg. (R. at 269.) Castle demonstrated stretching techniques to improve these complaints. (R. at 269.)

Kennedy returned to see Dr. Tacas on April 3, 2007, and reported that she had undergone surgery on her left knee by Dr. McIlwain. (R. at 228.) Kennedy denied any complaints of neck pain, but stated that she continued to experience joint pain in her legs and pain in her lower back. (R. at 228-29.) Kennedy stated that, in addition to suffering from anxiousness/stress, she had begun experiencing insomnia. (R. at 229.) Examination of Kennedy's back showed no tenderness, other than on the lower left side with some spasms, and full range of motion. (R. at 231.) Kennedy's straight leg raises were negative. (R. at 231.) Examination of Kennedy's extremities showed no swelling or tenderness and full ranges of motion.

(R. at 231.)  Dr. Tacas continued Kennedy's previous medications and prescribed Elavil. (R. at 231.)

Kennedy returned to see Castle on May 1, 2007, complaining of lumbar back pain, with pain radiating into the groin and right knee. (R. at 273.)  Castle noted that he had recommended in the past that Kennedy have arthroscopic surgery on her right knee. (R. at 274.)  Kennedy reported that she had been referred to a neurosurgeon, Dr. Ken Smith, M.D., for evaluation regarding her brain shunt and her lower back pain. (R. at 274.)

Kennedy returned to see Castle on May 23, 2007, complaining of increased back and right leg pain. (R. at 297-99.)  Castle noted palpable pain and tenderness across Kennedy's low back with radicular pain down her right leg. (R. at 298.)  Straight leg raises were negative, but Castle stated that she was very tight in her hamstring, calf and quadricep muscles bilaterally. (R. at 298.) Kennedy also complained of right arm pain. (R. at 298.) Castle noted negative Phalen's and Tinel's signs, but also noted some slight irritation of the ulnar nerve at the medial aspect of the right elbow. (R. at 298.)

On June 1, 2007, Dr. Thomas Phillips, M.D., a state agency physician, indicated that Kennedy had the residual functional capacity to perform light work. (R. at 290.) Dr. Phillips stated that Kennedy could stand and walk up to four hours and sit about six hours in an eight-hour workday. (R. at 290.) He stated that Kennedy could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 291.) He found that she could never climb ladders, ropes or scaffolds. (R. at 291.) No manipulative, visual, communicative or environmental

limitations were noted, other than a need to avoid working around hazards such as heights or machinery. (R. at 291-92.)

On June 26, 2007, Kennedy returned to Castle complaining of cervical neck pain, right upper extremity pain with numbness in the arm and hand, right lower leg pain and low back pain. (R. at 300-01.) She returned on July 26, 2007, for continuing complaints of cervical and lumbar pain. (R. at 303.)  Kennedy noted that she had recently been seen by Trish Cook, PA-C, with Dr. Jim Brasfield, M.D., a neurosurgeon. (R. at 303.) Kennedy's straight leg raises were negative with tightness noted in the hamstring, calf and quadricep muscles bilaterally. (R. at 303.) Because of Kennedy's shunt, Castle recommended that Dr. Brasfield evaluate and treat her for any disc surgery that may be necessary. (R. at 304.)

Kennedy returned to see Dr. Tacas on July 9, 2007, with complaints of increased anxiety and seeking a prescription for Xanax. (R. at 367-70.) Dr. Tacas's examination on July 23, 2007, showed that Kennedy's cervical spine was nontender with full range of motion. (R. at 376.) Her lumbar spine was tender with spasm on the left side with full range of motion and with negative straight leg raises. (R. at 376.) On August 24, 2007, Dr. Tacas noted that Kennedy's anxiety was helped by Xanax. (R. at 378.)

On August 20, 2007, Dr. Robert McGuffin, M.D., a state agency physician, indicated that Kennedy had the residual functional capacity to perform light work. (R. at 320.) Dr. McGuffin stated that Kennedy could stand and walk up to four hours and sit about six hours in an eight-hour workday. (R. at 320.) He stated that Kennedy could occasionally climb ramps and stairs, balance, stoop, kneel, crouch

and crawl. (R. at 321.) He found that she could never climb ladders, ropes or scaffolds. (R. at 321.) No manipulative, visual, communicative or environmental limitations were noted, other than a need to avoid working around hazards such as heights or machinery. (R. at 321-22.)

A cervical myelography was performed on Kennedy on September 20, 2007. (R. at 344-45.) The study revealed moderate degenerative disc narrowing and spondylosis at the C5-6 level and, to a lesser extent, at the C6-7 level, resulting in smoothly contoured extradural impressions on the anterior thecal sac. (R. at 345.) The radiologist stated that there was no indication of significant truncation or amputation of nerve root sheaths. (R. at 345.) A post-myelography CT scan showed broad-based disc protusions at the C5-6 and C6-7 levels, partially covered and subtended by irregular osteophyte formation. (R. at 347-48.)

On October 9, 2007, Kennedy returned to Dr. Tacas seeking a refill of her prescription for Xanax. (R. at 383.) Kennedy saw Dr. Tacas again on January 14, 2008, with complaints for lower back and neck pain. (R. at 388.) Examination of Kennedy's cervical spine revealed that it was not tender and had a full range of motion. (R. at 391.) Examination of her lumbar spine revealed that she was tender on the left with spasm, but with full range of motion and negative straight leg raises. (R. at 391.)

On December 18, 2007, Kennedy saw Dr. Fred R. Knickerbocker, M.D., for an orthopedic consult regarding both knees. (R. at 432-33.) Kennedy stated that she had some initial relief in her left knee pain after arthroscopic surgery by Dr. McIlwain, but she stated that her knee had never been pain-free. (R. at 432.) She

stated that her left knee continued to feel as if it would give way on her. (R. at 432.) Dr. Knickerbocker noted no deformity, effusion or swelling in either knee and no evidence of instability. (R. at 432.) Dr. Knickerbocker noted that Kennedy had good range of motion in both knees with neurovascular status to her legs intact. (R. at 432.) X-rays of her left knee showed no significant degenerative changes. (R. at 432.) Dr. Knickerbocker recommended ibuprofen for pain and stated that he could give Kennedy an injection in her knee if she had a significant flare-up of pain. (R. at 432.)

The record shows that Kennedy was admitted to Russell County Medical Center overnight on January 24, 2008, as a result of another kidney stone attack and urinary tract infection. (R. at 327-33.) On February 8, 2008, Kennedy told Dr. Tacas that she was following up with an urologist for continuing kidney stone attacks. (R. at 392.) Kennedy reported that the pain in her neck and back was a 7 on a 10-point scale without medication and a 2 on a 10-point scale with medication. (R. at 392.) Examination of Kennedy's cervical spine revealed that it was not tender and had a full range of motion. (R. at 395.) Examination of her lumbar spine revealed that she was tender on the left with spasm, but with full range of motion and negative straight leg raises. (R. at 395.) Kennedy returned to Dr. Tacas on March 7, and April 16, 2008, with similar complaints and findings. (R. at 397-404.) Kennedy returned on May 16, 2008, with complaints of burning pain in both of her feet. (R. at 405.) Kennedy also complained of numbness and tingling in her feet. (R. at 406.) Kennedy's back and neck exam were the same as before. (R. at 408.) Examination of her feet showed tender soles with diminished pulses. (R. at 408.) Dr. Tacas prescribed Neurontin. (R. at 408.)

On June 6, 2008, Dr. Tacas completed a Physical Residual Functional Capacity Questionnaire for Kennedy. (R. at 427-31.) Dr. Tacas stated that she saw Kennedy once a month for approximately 15 minutes. (R. at 427.) Dr. Tacas stated that Kennedy suffered from severe pain in her lower back, neck, left knee and feet. (R. at 427.) Although her medical reports have never documented any spasm anywhere other than in Kennedy's back, Dr. Tacas stated that Kennedy suffered from tenderness and spasms in her neck, back, left knee and both feet. (R. at 427.) Dr. Tacas did state that Kennedy's depression and anxiety affected her physical condition. (R. at 428.)

Dr. Tacas stated that Kennedy's pain or other symptoms were severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks. (R. at 428.) Dr. Tacas also stated that Kennedy was incapable of even "low stress" jobs. (R. at 428.) Dr. Tacas stated this was due to Kennedy's inability to walk, stand or sit for more than 30 minutes and her anxiety and depression. (R. at 428.) Dr. Tacas stated that Kennedy was able to walk only 10 steps without rest or severe pain. (R. at 428.) She stated that Kennedy could sit for only 15 minutes at a time and up to less than two hours in an eight-hour day and stand for only 15 minutes at a time and up to less than two hours in and eight-hour day. (R. at 428-29.) Dr. Tacas stated that Kennedy must walk for one minute every 15 minutes. (R. at 429.) Dr. Tacas further stated that Kennedy would be required to constantly take 30-minute breaks during the workday. (R. at 429.) Dr. Tacas stated that Kennedy could never lift any weight. (R. at 429.)

Dr. Tacas stated that Kennedy could never hold her head in a static position and could only rarely look down, turn her head to the left or right or look up. (R. at

430.) Dr. Tacas stated that Kennedy could never twist, stoop, crouch/squat, climb ladders or climb stairs. (R. at 430.) She also stated that Kennedy had significant limitations with reaching, handling or fingering. (R. at 430.) She stated that Kennedy could use her hands to grasp, turn or twist objects for only 10 minutes, use her fingers for fine manipulations for only 10 minutes and reach overhead with her arms for only 10 minutes. (R. at 430.) Dr. Tacas stated that Kennedy had no good days -- only bad days. (R. at 430.)

Dr. Tacas saw Kennedy on June 16, July 15, September 15, October 13, November 12, December 12 and December 22, 2008, for continuing complaints of pain in her neck, lower back and feet. (R. at 442-55, 465-95.) On October 13, Kennedy also complained of pain in her shoulders and a problem with dropping things from her right hand. (R. at 465.) Examination of her shoulders revealed that they were tender bilaterally. (R. at 469.) Dr. Tacas diagnosed Kennedy with polyneuropathy. (R. at 469.) On November 12, 2008, Dr. Tacas noted that Kennedy's anxiety was better with medication. (R. at 473.) Dr. Tacas also noted that Kennedy should "[w]atch activity." (R. at 479.)

Dr. Timothy G. McGarry, M.D., and Matthew Sykes, A.N.P., with Blue Ridge Orthopedics & Sports Medicine, saw Kennedy on November 19, 2008, for complaints of bilateral foot and heel pad pain. (R. at 457-58.) X-rays revealed generalized degenerative changes and spurring bilaterally. (R. at 458.) Kennedy complained of a dull ache in her heel pad, worse when she was on her feet for an extended period of time and somewhat relieved with rest. (R. at 457.) Examination showed good range of motion in Kennedy's ankles bilaterally with point tenderness in the heel pads, moreso on the left, and tightness in the heel cords. (R.

at 458.)  Dr. McGarry diagnosed bilateral plantar fasciitis, left greater than right. (R. at 458.)  He gave her a prescription for orthotics and injected each heel. (R. at 458.)  Kennedy returned on December 19, 2008, stating that the previous injections had given her about 70 percent relief of symptoms, but was starting to wear off. (R. at 459.) Examination revealed that Kennedy was diffusely tender at the insertion of both plantar fascia, more on the right. (R. at 459.)  Kennedy was informed of the option to seek surgical release. (R. at 459.)

On January 5, 2009, Dr. Tacas completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical).  (R. at 498-99.) Dr. Tacas stated that Kennedy could occasionally lift and carry items weighing less than five pounds and frequently lift and carry items weighing less than only two pounds. (R. at 498.) Dr. Tacas stated that Kennedy had "severe back disc disease." (R. at 498.) Dr. Tacas stated that Kennedy could stand and walk for less than 15 minutes in an eight-hour workday and for only one minute at a time. (R. at 498.)  She stated that Kennedy could sit for less than two hours in an eight-hour workday and for less than one hour without interruption. (R. at 498.)  She stated that Kennedy could never climb, stoop, kneel, balance, crouch or crawl. (R. at 499.) She stated that Kennedy was unable to reach, handle, feel and push/pull. (R. at 499.)

The record does not contain any evidence that Kennedy has ever sought any psychological, psychiatric or mental health treatment or counseling. The psychological evidence contained in the record consists of two Psychiatric Review Technique  forms, ("PRTF"), completed by state agency psychologists. (R. at 275-88, 305-18.) On June 1, 2007, E. Hugh Tenison, Ph.D., stated that Kennedy did not suffer from a severe mental impairment. (R. at 275.)  Tenison stated that Kennedy

had no restrictions of activities of daily living and no difficulties in maintaining social functioning. (R. at 285.) He stated that Kennedy did have mild difficulties in maintaining concentration, persistence or pace. (R. at 285.) On August 20, 2007, Eugenie Hamilton, Ph.D., stated that Kennedy did not suffer from a severe mental impairment. (R. at 305.) Hamilton stated that Kennedy had no restrictions of activities of daily living and no difficulties in maintaining social functioning. (R. at 315.) She stated that Kennedy did have mild difficulties in maintaining concentration, persistence or pace. (R. at 315.)

Dr. Tacas completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on January 5, 2009. (R. at 500-501.) On this form, Dr. Tacas stated that Kennedy had no useful ability to make occupational, performance and personal-social adjustments other than a limited, but satisfactory, ability to follow work rules and maintain personal appearance and a seriously limited, but not precluded, ability to relate to co-workers, to understand, remember and carry out simple and detailed job instructions, to behave in a emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 500-01.) Dr. Tacas stated that Kennedy's depression and anxiety were aggravated by pain. (R. at 501.)

Kennedy saw Dr. Gregory Corradino, M.D., on September 22, 2009, for complaints of low back and bilateral leg pain. (R. at 504-06.) Kennedy stated that she suffered sharp, constant back pain of an 8 or 9 on a 10-point scale. (R. at 504.) She stated that her leg pain was intermittent. (R. at 504.) Kennedy stated that the pain worsened with standing and prolonged sitting. (R. at 504.) She stated that the pain improved with changing positions often, walking or resting in a recliner. (R.

at 504.) Kennedy told Dr. Corradino that Dr. McIlwain recommended insertion of rods and pins in her back in 2007, a claim which is in no way substantiated by any evidence in this record. (R. at 504.)

Dr. Corradino's examination revealed a normal range of motion in Kennedy's neck with no tenderness. (R. at 505.) Forward bending of Kennedy's back was not limited, and no spasm or tenderness was noted on palpation. (R. at 505.) Muscle strength testing was normal and equal in Kennedy's upper and lower extremities. (R. at 505.) Straight leg raises were negative bilaterally. (R. at 505.) Dr. Corradino noted no edema, atrophy or deformity in Kennedy's extremities. (R. at 505.) He also noted that Kennedy walked without a limp. (R. at 505.)

Dr. Corradino stated that a CT scan of Kennedy's spine taken on August 31, 2009, showed a herniated disc at L5-S1 on the left and bulging discs at L2-3, L3-4 and L4-5. (R. at 505.) Dr. Corradino, however, stated that these findings did not indicate the need for surgical intervention or even further neurosurgical evaluation. (R. at 506.) He recommended continued conservative treatment, including consideration of epidural steroid injections. (R. at 506.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a

listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2010).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2010); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

In her brief, Kennedy argues that substantial evidence does not exist to support the ALJ's finding that she was not disabled. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-12.) In particular, Kennedy argues that the ALJ erred in her weighing of the medical evidence. (Plaintiff's Brief at 7-12.) It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains her rationale and if the record supports her findings.

Based on my review of the record, I find no error in the ALJ's weighing of the medical evidence. In reaching her findings with regard to Kennedy's residual functional capacity, the ALJ stated that she was rejecting the assessment completed by Kennedy's treating physician, Dr. Tacas. The ALJ stated that she was rejecting this opinion evidence because it was not consistent with Dr. Tacas's progress notes or the rest of the medical evidence in the case. (R. at 31.) Evidence from a treating physician will be given controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. *See* 20 C.F.R. § 404.1527(d)(2). Dr. Tacas's assessments of Kennedy's work-related abilities border on the absurd and simply are not supported by her own or any other medical reports contained in the record.

Dr. Tacas's June 6, 2008, assessment incorrectly stated that her opinions were supported by a history of spasm in Kennedy's neck, left knee and feet. (R. at 427.) She also stated that Kennedy walked with the assistance of a cane, which is contradicted by numerous medical statements that Kennedy used no assistive device. (R. at 260, 267, 429.) Furthermore, according to Dr. Tacas, Kennedy was unable to perform any substantial activity. (R. at 427-31.) For example, according to Dr. Tacas, Kennedy was unable to hold her head in a static position, but she also was only "rarely" able to move her head. (R. at 430.) Dr. Tacas stated that Kennedy was unable to walk more that 10 steps without resting or suffering severe pain. (R. at 428.) In fact, if Dr. Tacas's assessment was given any credence, Kennedy would have been bedridden for all but 1.5 hours of each day, in that at one point, Dr. Tacas stated that Kennedy could walk, stand and sit for only 30 minutes each a day. (R. at 428.) Furthermore, the medical records contain numerous statements that Kennedy's depression and anxiety improved with medication. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Over the years, Kennedy has been examined and/or treated by three orthopedic physicians and two neurosurgeons. None of these physicians ever placed any restrictions on Kennedy's work-related abilities. Furthermore, the only restriction regarding Kennedy's work-related abilities ever mentioned in Dr. Tacas's office notes was an admonition to "[w]atch activity." Also, Dr. Tacas has never even recommended that Kennedy undergo any mental health, psychological or psychiatric evaluation or treatment. Based on this, I find that sufficient evidence

exists to support the ALJ's weighing of the medical evidence and her finding with regard to Kennedy's residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's weighing of the medical evidence;

2. Substantial evidence exists to support the ALJ's finding with regard to Kennedy's residual functional capacity;

3. Substantial evidence exists to support the ALJ's finding that Kennedy could perform her past relevant work; and

4. Substantial evidence exists to support the ALJ's finding that Kennedy was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Kennedy's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     February 18, 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE